IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2021 Session

## JAMES E. CRYER v. THE CITY OF ALGOOD, TENNESSEE

Appeal from the Circuit Court for DeKalb County
No. 2018-CV-34    Amy V. Hollars, Judge

_____

## No. M2020-01063-COA-R3-CV
_____

Following a two-vehicle car accident in DeKalb County, Tennessee, between plaintiff James E. Cryer and a police officer, Mr. Cryer filed suit against the City of Algood alleging various acts of negligence.  The case proceeded to a bench trial and at the close of Mr. Cryer's proof, the trial court granted the City's motion for involuntary dismissal pursuant to Tennessee Rule of Civil Procedure 41.02(2).  The trial court ruled that no reasonable trier of fact could conclude Mr. Cryer was less than 50% responsible for the accident and that Mr. Cryer's claims were therefore barred.  Mr. Cryer appeals.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Edward A. Herbert, Nashville, Tennessee, for the appellant, James Edward Cryer.

Daniel H. Rader IV & André S. Greppin, Cookeville, Tennessee, for the appellee, The City of Algood, Tennessee.

## OPINION

### BACKGROUND

On May 15, 2017, plaintiff Mr. Cryer and his wife, Rena Cryer, and Officer Christopher Ferguson were involved in a vehicle crash in DeKalb County.  At the time, Officer[1] Ferguson was employed as a police officer by the City of Algood (the "City"),

---

[1] By the time of trial, Officer Ferguson had been promoted to sergeant.

having been hired in 2015. The crash, which was recorded by a camera posted outside a nearby business, occurred after Mr. Cryer attempted to turn his SUV left onto U.S. Highway 70, intending to cross two eastbound lanes of traffic and a center turn lane in order to head west. Simultaneously, Officer Ferguson was driving in the left eastbound travel lane. The video footage shows that before pulling into the road, Mr. Cryer waited for a white van to pass, and that behind the white van, a black car and Officer Ferguson's white police cruiser approached in the right and left travel lanes, respectively. Officer Ferguson was going significantly faster than the black car traveling in the right lane. As Mr. Cryer attempted to cross the two eastbound lanes, Officer Ferguson's vehicle struck the rear portion of the driver's side of Mr. Cryer's SUV. Mr. Cryer was ejected from the vehicle, and both Mr. and Mrs. Cryer, who was in the passenger seat, suffered injuries. It is undisputed that Officer Ferguson was speeding at the time of the accident, and the proof at trial showed he was traveling approximately 60 miles per hour in a 40 mile per hour zone.

Mr. Cryer and Mrs. Cryer filed suit against the City in the Circuit Court for DeKalb County (the "trial court") on May 11, 2018, alleging negligence, negligence per se, negligent entrustment, and negligent hiring.[2] Mr. Cryer averred that at the time of the accident, Officer Ferguson was traveling at an excessive and dangerous rate of speed in violation of several Tennessee statutes. He further alleged that Officer Ferguson had a history of having car accidents while driving his police vehicle and that the City was aware of this history when Officer Ferguson was hired in 2015. Mr. Cryer sought compensatory as well as punitive damages.

The City answered the complaint on July 10, 2018, its primary defense being that Officer Ferguson did not cause the accident because Mr. Cryer turned in front of Officer Ferguson. The City raised the defense of comparative fault and asserted a counterclaim against Mr. Cryer for negligence and negligence per se. The City sought $75,000.00 for damages to the police vehicle. Mr. Cryer answered the City's counterclaim on August 6, 2018. A long series of discovery disputes and trial continuances ensued.

On November 15, 2019, the City filed its trial witness list, which included "any witness identified by [Mr. Cryer]." Mr. Cryer's witness list included several people, one of whom was Mrs. Cryer. The case proceeded to a bench trial on June 23, 2020. The first witness called by Mr. Cryer was Officer Ferguson, who admitted that he was going approximately 60 miles an hour when he struck Mr. Cryer's vehicle, but explained that at the time he believed the speed limit was 45 miles per hour rather than 40. While Officer Ferguson testified that he was unfamiliar with the area in which the accident occurred, the road was straight, the weather was clear, and there were no obstructions to his view. As

---

[2] Initially, Mr. and Mrs. Cryer asserted claims against both the City and Officer Ferguson individually. By the time of trial, however, Mrs. Cryer's claims were settled and Officer Ferguson had been dismissed as a defendant. The only parties to the present appeal are Mr. Cryer and the City.

corroborated by the video of the accident, Officer Ferguson testified that he was in the left-hand travel lane headed east on the highway when the accident occurred and that he had passed the black car that was traveling alongside him in the right-hand lane. According to Officer Ferguson, the cause of the accident was Mr. Cryer pulling out in front of Officer Ferguson, and there was nothing Officer Ferguson could do to prevent impact. Instead, Officer Ferguson testified that he hit his brakes and pulled his wheel to the right to avoid hitting Mr. Cryer's vehicle directly on the driver's side door.

Sergeant John McFarland of the Tennessee Highway Patrol also testified and was certified by the trial court as an expert in accident reconstruction. Sergeant McFarland testified that he had inspected the scene of the accident on May 15, 2017, and thereafter inspected the airbag control module ("ACM") of Officer Ferguson's police car. According to Sergeant McFarland, Officer Ferguson's speed at the time of impact was 62 miles per hour, and the vehicle reached up to 66 miles per hour in the minutes prior to impact. Based on Sergeant McFarland's calculations, if Officer Ferguson had been traveling the speed limit, he would have needed two-hundred fifty feet in order to avoid impact with Mr. Cryer's vehicle, and Officer Ferguson was approximately three hundred feet from Mr. Cryer when Mr. Cryer turned left onto the highway. However, Sergeant McFarland also conceded that the distance needed for Officer Ferguson to stop could be a little more or a little less depending upon Mr. Cryer's movements. Sergeant McFarland also testified that in his opinion, Officer Ferguson was distracted just before the accident because the brake was only applied three one-hundredths of a second before impact. Sergeant McFarland testified that the accident could have been avoided if Officer Ferguson was traveling at a lower speed, but maintained that because Mr. Cryer failed to yield to Officer Ferguson, Mr. Cryer was more than 50% at fault for the accident.

The trial court next heard from Mr. Cryer, who essentially maintained that if Officer Ferguson had not been traveling at such a high rate of speed, Mr. Cryer would have been able to safely cross the eastbound lanes of the highway. However, Mr. Cryer did not remember much detail about the accident and at one point stated that he did not know how the accident occurred. Mr. Cryer explained that while he saw the black car that was traveling alongside Officer Ferguson's vehicle, Mr. Cryer never saw Officer Ferguson's police cruiser. Specifically, Mr. Cryer testified:

> Q. So are you saying that you had room before the white van, or are you saying that you saw the cars behind the white van?
>
> A. No. I had room before the white van got there, but I still didn't do it. And then after he passed, I started easing out.
>
> Q. On the left-hand —
>
> A. I didn't see nothing. Huh?

Q. On the left-hand screen. -- can you see that clearly?

A. Yeah. I can see it, but it's way back there

Q. Do you see the black car that's been referenced throughout the trial and Officer Ferguson's car?

A. No, sir.

Q. You don't see either one of them, or just Officer Ferguson's?

A. I didn't see Officer Ferguson's car. I did see the black one.

Q. You did see the black car?

A. I knew I had time to get out there.

Q. I know it's been a long time. As you sat there at that exit, do you recall when you saw that black car behind the white van?

A. No, sir. I can't recall.

Q. But you do remember seeing it?

A. Yeah.

Q. Do you remember --

A. The black one.

Q. And you believe that you had enough room to pull out between the white van and black car?

A. Yes, sir.

Q. And safely cross the two eastbound lanes?

A. Yes, sir.

Q. At the moment you started to pull out of Glen's Auto, do you recall where your attention was?

- 4 -

A.    No, I don't.

Q.    Up until that point, had you been looking left and right?

A.    Yes.

Q.    At any time up until this moment of the collision, did you see Officer Ferguson's car traveling in that lane?

A.    No. I did not. It may have been behind that other car. I don't know where any of that is at the time I looked.

Mr. Cryer testified that although he looked both directions before pulling onto the highway, he never saw Officer Ferguson's vehicle.  Mr. Cryer also testified that Mrs. Cryer was talking to him as he was attempting to turn, which was later corroborated by Mrs. Cryer. It was also revealed at trial that Mr. Cryer had potentially taken hydrocodone for back pain the morning of the accident, although Mr. Cryer could not recall for certain.

After Mr. Cryer's testimony, his counsel attempted to call Gary Harris, who was the Chief of the Algood Police at the time Officer Ferguson was hired.  The following exchange occurred:

MR. RADER: Your Honor, Mr. Harris is not here. Mr. Harris is on my witness list, and I do expect that he will be available during my case, but I told him as recently as lunch that I didn't anticipate getting to his testimony until sometime well after 3:30, based on the time that I thought that this would take. Quite frankly, I thought Mr. Cryer's testimony would take well over an hour, and that Mrs. Cryer would be next. In fact, none of the personnel from the City of Algood are here except for Officer Ferguson.

MR. HERBERT: He's our next witness, Your Honor. I'm not sure we're even going to call Ms. Cryer.

THE COURT: Is there any way that we might call Mr. Harris and see if he might get here more quickly?

MR. RADER: I told him to go ride his motorcycle, but I will try to text him and see if I can get him. Actually, I don't have his phone number. I have got to tell Mr. Morris and see if he can get him.

THE COURT: All right.

MR. RADER: May it please the Court, we are going to call Rena Cryer. If we can go ahead and call her, whether it's part of their case or part of ours, at least we're not sitting here waiting on somebody to come up here.

THE COURT: Mr. Herbert?

MR. HERBERT: I'm fine with that.

Consequently, Mrs. Cryer testified briefly, primarily regarding her recollection of the accident. According to Mrs. Cryer, the day was clear and the relevant stretch of road was straight and unobstructed. Mrs. Cryer recalled telling Mr. Cryer to put his seatbelt on just before the accident. Like Mr. Cryer, Mrs. Cryer never saw Officer Ferguson's police cruiser; however, after watching the video footage of the accident, Mrs. Cryer admitted that Officer Ferguson's vehicle was visible when Mr. Cryer was making his left turn.

The last witness to testify was Mr. Harris, who primarily testified to the hiring of Officer Ferguson.[3] Thereafter, the City moved for involuntary dismissal of Mr. Cryer's case, arguing that "no reasonable trier of fact could hold that Mr. Cryer was any less than [50%] responsible, and, therefore, the claims are due to be dismissed." After a short recess, the trial court orally granted the City's motion, finding as follows:

> Having considered the exhibits, the testimony that we have heard today, and the record as a whole, the Court concludes that the plaintiff has not carried [his] burden, and so will grant this motion for involuntary dismissal under Rule 41.

> The Court saw in the proof that Sergeant Ferguson was speeding, and that also, he must have been in some way distracted in keeping a lookout ahead. Sergeant McFarland noted that he was able to, at the last minute, apply his brakes and try to make an evasive action to the right. So even though when, the Court considers the fact that Sergeant Ferguson, was indisputably speeding, the question still is whether that constituted the proximate cause of this accident, and the Court concludes that it did not constitute the proximate cause of this accident.

> [S]ome of the particular facts that were meaningful to the Court were the breakdown by second of the videos, where we saw Mr. Cryer pull up to the edge of that lot. The Court would find and note that his attention

---

[3] On appeal, Mr. Cryer makes no argument regarding the trial court's disposition of the negligent hiring and negligent entrustment claims arising from Officer Ferguson's employment, and instead addresses only the negligence claim arising directly from the accident. As such we do not address the negligent hiring or negligent entrustment claims.

apparently was on the white van, and that when he – when that white van was approaching the outlet from the car lot, he was already in motion, and ready to make his move across the lanes of traffic. The Court noted – when the brakes were applied and when those brake lights went off, the Court noted the portion of the video where it showed his forward movement. And this is an open and straight road, and in this situation, for some reason, Mr. Cryer didn't see officer – Sergeant Ferguson coming.

[W]e have views that were helpful to the Court in looking down the road toward the oncoming traffic in the lanes that officer – that Sergeant Ferguson was traveling in, and a more straight-ahead view. These were of assistance to the Court, because they did show that Officer Ferguson – Sergeant Ferguson, I apologize, was – his vehicle was visible and should have been visible to Mr. Cryer as he attempted to make this turn and to come out into the lanes of traffic.

Additionally, the Court notes that Mrs. Cryer very candidly indicated that she recalled having been speaking to Mr. Cryer as he was pulling out. She remembered him trying to make the motion from left to right, and that she often had to advise him and remind him about wearing his seatbelt. But this is – that motion might have been distracting to him, but Mrs. Cryer was very candid and said that that's what she thought she remembered. The Court finds that no reasonable trier of fact could find under these facts that Mr. Cryer was less than [50%] at fault.

The trial court entered a written order incorporating the above findings on July 15, 2020. Mr. Cryer's case was dismissed in its entirety, the trial court reiterating that "no reasonable trier of fact could find that Mr. Cryer was less than 50% at fault for the accident and his own injuries[,]" and that "Mr. Cryer's fault bars this claim."  The trial court specifically relied on two cases, explaining that it found *Hall v. Owens*, No. W2014-02214-COA-R3-CV, 2015 WL 7354384 (Tenn. Ct. App. Nov. 20, 2015), and *Tennessee Trailways, Inc. v. Ervin*, 438 S.W.2d 733 (Tenn. 1969), persuasive under the circumstances.  Mr. Cryer filed a timely notice of appeal to this Court.[4]

## ISSUES

Mr. Cryer raises several issues on appeal, which we consolidate and restate as follows:

Whether the trial court erred in granting the City's Rule 41.02 motion for involuntary dismissal of Mr. Cryer's claims.

---

[4] The City voluntarily nonsuited its counterclaim against Mr. Cryer.

## STANDARD OF REVIEW

A trial court's grant of an involuntary dismissal is reviewed pursuant to the standard provided in Tenn. R. App. P. 13(d). *Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). This is because "the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence." *Id.* (citing *College Grove Water Util. Dist. v. Bellenfant*, 670 S.W.2d 229, 231 (Tenn. Ct. App. 1984)). We therefore review the case de novo, presuming the trial court's factual findings are correct unless the record preponderates otherwise or unless the trial court committed an error of law affecting the outcome of the case. *Id.* (citing *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)). We afford the trial court's findings on witness credibility great weight. *Id.* (citing *Thompson v. Adcox*, 63 S.W.3d 783, 787 (Tenn. Ct. App. 2001)).

## DISCUSSION

Although Mr. Cryer designates several issues for review, in essence he raises the single issue of whether the trial court erroneously granted the City's motion for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02(2), and posits several arguments in support. Mr. Cryer first challenges the trial court's conclusion that a reasonable trier of fact could not conclude that Mr. Cryer was less than 50% at fault for the accident, and he asserts that the record preponderates against several of the trial court's factual findings. Mr. Cryer also asserts that, per the language of Rule 41.02(2), the trial court erred in considering evidence offered by the defendant City, namely, the testimony of Mrs. Cryer.

Tenn. R. Civ. P. 41.02(2) provides:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff[']s evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

Rule 41.02(2) motions "do not raise questions of law but rather challenge the sufficiency of the plaintiff's proof." *Burton*, 129 S.W.3d at 520 (citing *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821 (Tenn. Ct. App. 1992)). If, based on the law and evidence, the plaintiff

fails to demonstrate a right to the relief sought, a claim may be dismissed pursuant to Rule 41.02(2). *Burton*, 129 S.W.3d at 520. Consequently, "a court faced with a Tenn. R. Civ. P. 41.02(2) motion need only impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases and may dismiss the plaintiff's claims if the plaintiff has failed to make out a prima facie case by a preponderance of the evidence." *Id.* (citing *Thompson*, 63 S.W.3d at 791).

Here, the trial court concluded that Mr. Cryer failed to demonstrate a right to relief because his own fault barred his negligence claim. Under Tennessee's system of modified comparative fault, "[s]o long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover[.]" *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992). Thus, if a plaintiff's negligence is equal to or greater than 50%, recovery for damages is barred. *Id.* While the trial court concluded that two cases are persuasive under these circumstances, on appeal the parties dispute whether the trial court's interpretation of those cases was correct.

In *Tennessee Trailways*, 438 S.W.2d 733, a deceased motorcyclist's estate sought damages against a bus company after the motorcyclist was hit and killed by one of the defendant's drivers. In that case, the bus was traveling northbound on a highway and the motorcyclist "was riding . . . on [a] private roadway toward the intersection." *Id.* at 734. The motorcyclist "drove across [the highway] and into the right, or northbound, lane where he was struck and killed by defendant's bus." *Id.* The estate alleged, *inter alia*, that the bus was negligent because it was exceeding the 65 miles per hour speed limit at the time of accident. *Id.* At trial, the parties offered conflicting evidence regarding the bus's speed; passengers maintained that the bus was going less than 65 miles per hour, while the estate offered an expert witness who opined that the bus was traveling at 73.5 miles per hour. *Id.* At the close of the estate's proof, the trial court directed a verdict for the defendant. *Id.* The Court of Appeals subsequently reversed, concluding that the "expert witness created a disputed question of fact as to the speed of defendant's bus at the time of the accident." *Id.*

On appeal to the Supreme Court, the salient question was "what causal significance did any unlawful speed of defendant's bus bear to the collision." *Id.* at 735. The Court concluded that it was "too clear for argument that the asserted differential in the bus' speed simply could not be a realistic proximate cause of the accident[,]" inasmuch as the record left "no doubt but that [the motorcyclist] rode his motorcycle up to the intersection, either hesitated or stopped, and, with the bus in unobstructed view, suddenly and abruptly crossed the highway into the northbound lane to the point of collision." *Id.* The Court also stated that whether the bus was speeding was insignificant because "it is plain that the immediate cause of the collision" was "the sudden and heedless entry of [the motorcyclist]" onto the highway. *Id.*

The second case relied on by the trial court, *Hall v. Owens*, also dealt with a vehicle turning onto a highway in front of another vehicle. 2015 WL 7354384. In that case, Mr.

- 9 -

Hall approached an intersection in Jackson, Tennessee, and entered the turn lane, intending to turn left across a northbound lane of traffic. *Id.* at *1. It was undisputed that the traffic signal facing Mr. Hall was red. *Id.* Nonetheless, Mr. Hall "accelerated into the intersection" and was struck by a tractor-trailer traveling in the northbound lane. *Id.* Like the case at bar, a nearby camera recorded the accident. Mr. Hall's conservator later filed suit against the company that owned the tractor-trailer, alleging that the truck driver's negligence was the direct and proximate cause of the accident. *Id.* The conservator retained an expert accident reconstructionist who asserted that the truck was traveling 60 to 65 miles per hour in a 55 mile per hour zone when the accident occurred. *Id.* at *2.

The defendant maintained, however, that the traffic camera footage showed the truck was traveling under the speed limit. *Id.* The defendant eventually filed a motion for summary judgment, arguing that in light of the video footage no reasonable fact-finder could conclude that Mr. Hall was less than 50% at fault for the accident. *Id.* The trial court granted the defendant's motion and Mr. Hall's conservator appealed.

This Court affirmed the trial court's decision, explaining as follows:

> Even taking all of the Halls' evidence as true and viewing it in the light most favorable to them, the Halls have failed to establish a genuine issue of material fact. . . . The Halls admit that Mr. Owens's truck was well-illuminated and there was nothing blocking Mr. Hall's view of it. The Halls' expert witness, Mr. Langley, testified in his deposition that Mr. Hall was the first driver to set the accident in motion and was the last driver with the opportunity to avoid the collision. The Halls assert that Mr. Owens's truck was traveling in excess of the posted 55 mile per hour speed limit at a rate of 60 to 65 miles per hour prior to braking and that Mr. Owens could have avoided the collision by braking sooner. Assuming these facts to be true, however, no reasonable juror could conclude that Mr. Owens was at least 50% at fault for the accident in light of the undisputed facts that Mr. Hall ran a red light to turn left across oncoming traffic and was hit by Mr. Owens's truck as it proceeded through the intersection on a green light. At best, the Halls' evidence only shows that Mr. Hall may not have been 100% at fault for the accident; no reasonable juror could find Mr. Hall to be less than 50% at fault for the accident.

*Id.* at *4.

Notwithstanding slight factual differences, we agree with the trial court that the above cases are helpful and that no reasonable fact-finder could conclude that Mr. Cryer was less than 50% at fault for the accident with Officer Ferguson. As in *Hall*, the most probative evidence in this case is the video footage of the accident. The footage clearly demonstrates that, while Officer Ferguson was traveling at an excessive speed, Officer

Ferguson's vehicle was visible to Mr. Cryer when he pulled onto the highway. Although no video footage of the *Tennessee Trailways* accident exists, the Court's description of the motorcyclist's entry into the roadway as "sudden and heedless" is consistent with the video evidence offered in this case.

On appeal, Mr. Cryer maintains that this case is distinguishable from *Tennessee Trailways* and *Hall* because for a few brief moments before the accident, visibility of Officer Ferguson's vehicle was somewhat obscured by the black car that was traveling next to Officer Ferguson in the right-hand travel lane of U.S. Highway 70 eastbound. In this vein, Mr. Cryer argues that the present case is more akin to *Monypeny v. Kheiv*, No. W2014-00656-COA-R3-CV, 2015 WL 1541333 (Tenn. Ct. App. Apr. 1, 2015). In that case, an elderly couple, the Sadowskis, were struck while turning their SUV out of a mall area and onto a highway in Memphis. *Id.* at *1. The highway had six lanes, with three lanes running east and three lanes running west, separated by a grass median. *Id.* at *2. It was unclear whether the Sadowskis were attempting to turn right and head east on the highway, or cross the eastbound lanes and turn left into the westbound lanes. *Id.* In any event, almost immediately after they entered the highway, Mr. Kheiv collided with the Sadowskis. *Id.* An eye-witness testified that just before the collision occurred, Mr. Kheiv was following closely behind her as she drove in the middle eastbound lane. *Id.* Mr. Kheiv was driving so closely that the witness thought he was going to hit her. *Id.* According to the witness, at the last second, Mr. Kheiv swerved out from behind the witness's car in the middle lane, entered the right lane, and "almost immediately" collided with the Sadowskis. *Id.* Because of the defendant's last-minute swerving, the witness opined that Mr. Sadowski, who was driving the Sadowskis' SUV, could not have seen Mr. Kheiv's vehicle as Mr. Sadowski was turning. *Id.* at *8.

Mr. Sadowksi and the children of Mrs. Sadowski ("plaintiffs") filed suit against Mr. Kheiv.[5] *Id.* at *3. The case proceeded to a jury trial, and the defendant moved for a directed verdict pursuant to Tenn. R. Civ. P. 50.01 at the close of the plaintiffs' proof. *Id.* at *6. The defendant relied on *Tennessee Trailways*, urging that *Tennessee Trailways* was analogous and that, as a matter of law, "the proximate cause of that accident was Mr. Sadowski. . . . he has a duty under the law to see that which is there to be seen." *Id.* The trial court denied the defendant's request and ruled that the question of fault should go to the jury. *Id.* at *7.

After the jury returned a verdict for plaintiffs, the defendant appealed several issues to this Court, one of which was whether the trial court should have granted the motion for directed verdict. *Id.* We disagreed with the defendant, explaining that:

---

[5] Because Mr. Kheiv was uninsured, Mr. Sadowski's uninsured motorist carrier defended the case at trial and on appeal.

- 11 -

[a]lthough the *Tennessee Trailways* case may be instructive on the issue of how much fault should be assigned to Mr. Sadowski, following the adoption of comparative fault in Tennessee, *Tennessee Trailways* does not, necessarily, preclude assignment of liability to Mr. Kheiv. In fact, the instant case is distinguishable from *Tennessee Trailways*, where the Tennessee Supreme Court held that there was "no doubt that plaintiff's intestate rode his motorcycle up to the intersection, either hesitated or stopped, and, with the bus in unobstructed view, suddenly and abruptly crossed the highway into the northbound lane to the point of collision." 438 S.W.2d at 735. Under this scenario, the Court reasoned that "whether the bus was traveling 73.5 miles per hour or 63 miles per hour, speed was not a proximate cause of the accident as a matter of law." *Id.* The Court stated that it was "plain that the immediate cause of the collision was not the speed of the bus; but apparently the sudden and heedless entry of plaintiff's intestate onto the north side of the highway." *Id.* As noted above, in reviewing the denial of a motion for directed verdict, this Court must view the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander*, 24 S.W.3d at 271; *Eaton*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d at 199. Applying this standard to the facts at bar, we conclude that unlike the plaintiff's intestate in Tennessee Trailways, who heedlessly pulled into the path of an observed vehicle, here, there is evidence that Mr. Sadowski may not have had the opportunity to observe the Kheiv vehicle as it approached[.]

*Id.* As such, the trial court in *Monypeny* did not err in refusing to direct a verdict for the defendant.

Based on the foregoing, Mr. Cryer avers that Officer Ferguson's vehicle was an "unobserved" vehicle and that Mr. Cryer could not have seen it. Mr. Cryer opines:

The Algood patrol car could have been masked from view when Mr. Cryer determined that it was safe to cross the eastbound lanes. The Defense also fails to account for the white van that could have blocked Mr. Cryer's view. (Trial Ex. 2, Transc. 138). As the white van passes, Mr. Cryer begins to move forward. After observing the oncoming traffic from the eastbound lanes, it is natural that Mr. Cryer's attention would also be on the westbound lanes where he intended to go. (Transc. 171-175, 207-209). It was at this time that the Algood Patrol car becomes unobscured in the left-hand lane, but only because the excessive speed of the patrol car has now placed it in such a position.

As we understand it, Mr. Cryer maintains that because Officer Ferguson's vehicle was aligned with the black car in the right travel lane and only overtook the black car after Mr. Cryer had already looked in that direction and was then looking elsewhere, Mr. Cryer's view of Officer Ferguson's vehicle was not "unobstructed" as addressed in *Tennessee Trailways* and *Hall*. The video footage belies this position. Notwithstanding the placement of the black car or the distraction of vehicles in the westbound lanes, the video establishes that Officer Ferguson was clearly visible from Mr. Cryer's perspective when Mr. Cryer began pulling onto the highway. Indeed, the video shows that at the exact moment Mr. Cryer accelerated forward, Officer Ferguson had passed the black car in the right-hand lane and was well-within Mr. Cryer's line of sight. Although Mr. Cryer posits in his brief that Officer Ferguson's vehicle only "[became] unobscured in the left-hand lane" because "the excessive speed of the patrol car. . . placed it in such a position[,]" this does not change the fact that Officer Ferguson's vehicle was in fact unobscured. Stated simply, Mr. Cryer is no less responsible for turning in front of a clearly visible vehicle merely because the driver of that vehicle was speeding.

For these reasons, we are unpersuaded that *Monypeny* is analogous here. Our decision in that case was based in part on "evidence that Mr. Sadowski may not have had the opportunity to observe the Kheiv vehicle as it approached[.]" 2015 WL 1541333, at *7. Indeed, this was how we distinguished that case from *Tennessee Trailways*. In the present case, however, there is no such evidence, and the video footage establishes quite the opposite. Even Mrs. Cryer conceded after viewing the video at trial that Officer Ferguson's vehicle was observable when Mr. Cryer pulled onto the highway. Mr. Cryer also notes on appeal that *Tennessee Trailways* was decided "decades before [the] Court adopted the doctrine of modified comparative fault in 1992." We disagree that this renders *Tennessee Trailways* inapposite. As we stated in *Monypeny*, *Tennessee Trailways* is still instructive in allocating fault inasmuch as that case does not outright preclude assignment of liability. 2015 WL 1541333, at *7. Further, this Court has squarely rejected this argument. *See Perry v. Dewey*, No. 02A01-9406-CV-00142, 1995 WL 422660, at *5 (Tenn. Ct. App. July 18, 1995) ("There is nothing in *McIntyre v. Balentine* [ ] in which our Supreme court adopted the comparative fault system, or subsequent decisions of this state, which renders the holdings of ---- *Tennessee Trailways* and like cases on contributory negligence obsolete as far as they are relevant to the case at bar. In changing the law of negligence, comparative fault simply allows recovery in situations where the plaintiff may have previously been barred because of her own negligence.").

The record does not preponderate against the trial court's finding that Officer Ferguson's vehicle was visible and should have been seen by Mr. Cryer. The record also does not preponderate against the trial court's finding, based on Mrs. Cryer's testimony, which the trial court found credible, that Mr. Cryer was distracted when attempting to make his left turn.[6] Accordingly, we agree with the trial court that no reasonable trier of fact

---

[6] Mrs. Cryer also testified that right after the accident Mr. Cryer had cataract surgery to correct

could conclude that Mr. Cryer is less than 50% responsible for the accident. At most, the evidence establishes that Mr. Cryer may not have been 100% at fault for the accident.

Next, Mr. Cryer argues that the trial court erred in "relying on testimony of a witness called by the Defense prior to the close of Plaintiff's proof." In its final order, the trial court wrote: "The Court notes Mrs. Cryer's candid recollection of speaking to her husband at the time he pulled out, and Mrs. Cryer's recollection of her husband's motion in his vehicle, pulling from left to right. The Court finds that Mr. Cryer was distracted." According to Mr. Cryer, the trial court should have evaluated only Mr. Cryer's evidence per the language of Rule 41.02(2), which provides in pertinent part:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff[']s evidence, the defendant . . . may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

Mr. Cryer also notes the well-settled principle that when considering a motion for involuntary dismissal, a trial court should "impartially weigh and evaluate the plaintiff's evidence[.]" *Wilson v. Monroe Cnty.*, 411 S.W.3d 431, 439 (Tenn. Ct. App. 2013). Mr. Cryer posits that "given the plain language of the statute and applicable law[,]" the trial court erred in relying on Mrs. Cryer's testimony.

We disagree with Mr. Cryer regarding the plain language of Rule 41.02(2) and find the second sentence of the Rule salient here: "The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief." Although our research has revealed no case law specifically construing this portion of the Rule, the advisory comments provide that this sentence, which was added in 1998, "was thought necessary in light of Tennessee's adoption of comparative fault." Consequently, under the particular circumstances of this case and in light of the plain language of Rule 41.02(2), the trial court did not err in considering the testimony of Mrs. Cryer. [7]

Mr. Cryer's final argument on appeal is that the record preponderates generally against the trial court's factual findings. In light of all of the foregoing, and after a thorough review of the record, we find this contention without merit and affirm the ruling of the trial court.

---

blurry vision.

[7] Neither party has argued on appeal that the trial court should have reserved ruling on the City's motion. Moreover, the trial court's ruling was primarily based upon the video footage, and we agree with its assessment of same. It is doubtful, therefore, that further evidence from the City would have altered the outcome of this case, inasmuch as further evidence would, presumably, only have served to buttress the City's position. To the extent that it was error not to reserve ruling on the City's motion then, any error was harmless and we need not address it.

## CONCLUSION

The judgment of the Circuit Court for DeKalb County is affirmed. Costs of this appeal are taxed to the appellant, James E. Cryer, for which execution may issue if necessary.

_____

_____
KRISTI M. DAVIS, JUDGE